BOARD OF EDUCATION OF GOLF SCHOOL DISTRICT NO. 67, COOK COUNTY, Plaintiff-Appellant, *v.* REGIONAL BOARD OF SCHOOL TRUSTEES OF COOK COUNTY *et al.*, Defendants-Appellees.

First District (3rd Division)    No. 80-730

Opinion filed August 29, 1980.

David P. Kula and John F. Canna, both of Anthony Scariano & Associates, P. C., of Chicago, for appellant.

Russell M. Pelton, Pat Chapin, and Craig A. Varga, all of Peterson, Ross, Schloerb & Seidel, of Chicago, for appellees.

Mr. JUSTICE RIZZI delivered the opinion of the court:

A petition to detach certain property from School District No. 67, Cook County, Illinois, and to attach that property to School District No. 34, Cook County, Illinois, was allowed by the Regional Board of School Trustees of Cook County (Board). A complaint for administrative review was filed, and the circuit court affirmed the decision of the Regional Board. We affirm in part and reverse in part with directions.

The petition for detachment was signed by more than two-thirds of the registered voters in the detachment area. The detachment area includes the entire Village of Golf and that part of the Village of Glenview north of Golf Road and east of Waukegan Road, which is known as Golf Acres. The petitioners from the detachment area reside in School District No. 67, and the children in the area attend school in Morton Grove. The petitioners wish to be included instead in School District No. 34 so that the children are able to attend school in Glenview.

The entire detachment area is within the Glenview Park District, and the programs of the Glenview Park District are supported in part by real estate taxes levied on property in the detachment area. The Glenview Park District coordinates its programs very closely with District 34 and uses the facilities of District 34. The park district conducts sports programs at District 34 schools, but the students from District 67 do not normally engage in them because they begin immediately after school. A detachment area resident testified that the children from the area sometimes choose not to participate in park district programs because they feel like outsiders. This resident finds it very frustrating that her children's friends come from schools south of Golf Road and their activities take place north of Golf Road.

An after-school program of sports activities, including intramural sports, is provided for District 67 students. No special bus is provided for the Glenview or Golf Acres students at the conclusion of these activities.

The Board of Commissioners of the Glenview Park District adopted a resolution supporting the detachment petition. In the resolution, the Board noted that for many years the park district has provided an exchange of services agreement pursuant to which the park district provided recre-

ational programs in school districts having schools within the park district. District 67 has no schools within the park district.

The boundaries of the area served by the Glenview Public Library are the same as the boundaries of the Village of Glenview. The Village of Golf is not included in the library district, but the residents of Golf may use the library if they pay a nonresident fee. Taxes of all residents of Glenview support the library.

The Glenview Public Library stocks books in accordance with the curriculum of District 34. The children's librarian works closely with District 34's coordinators. Each year the library invites teachers from District 34 to meet with its staff and see its collection of books. The library distributes a list of available services and facilities throughout the District 34 schools.

A resident of the detachment area testified that announcements regarding registration for the Glenview Little League, which serves Golf and Glenview, are not sent to District 67 students living in Golf or Golf Acres. Notices are circulated to the District 34 students. He also testified that students in the detachment area would join Boy Scouts or Cub Scouts in Glenview; the Morton Grove Boy Scout Council does not include Golf or Golf Acres. The Rotary Club of Glenview and the Jaycees and Kiwanis organizations in Glenview include Golf in their territory.

Another detachment area resident testified that the preschool children in the area attend a preschool which follows District 34's school calendar. Therefore, her children in the District 67 schools have a different vacation schedule than her child in preschool. She also pointed out that the detachment area preschool children attend a different elementary school than their preschool classmates outside the detachment area. Another detachment area resident who lives in Golf stated that her telephone book does not contain the number for the elementary school attended by the detachment area students.

The students in the detachment area must cross Golf Road in order to reach the District 67 schools in Morton Grove. Testimony regarding accident rates on Golf Road indicates that the intersection of Golf and Waukegan has a higher accident rate than any other intersection in the area. The bus route proposed if the detachment petition is granted would avoid the intersection of Golf and Waukegan. Golf Road would be avoided entirely. The District 34 schools are farther from the detachment area than the District 67 schools.

The Board of District 67 has voted to close one of the schools in the district in September of 1981. One member of the District 67 board testified that the decision to close this school would result in initial overcrowding in the remaining elementary school. He stated that the overcrowding

could be alleviated to some extent if the detachment area students would be withdrawn. The superintendent of the schools in District 67 testified that no overcrowding would result.

Dr. Frank Vogel testified as petitioners' education expert. In his opinion, District 34 has a "full, thorough, and comprehensive program." Both districts cover the same material as most districts in Cook County. The proposed detachment would not affect the ability of either district to meet State recognition standards. Dr. Vogel concluded that there would be no negative implications from an educational standpoint for students to transfer from District 67 to District 34. He also stated that he saw no detriment to District 67, and that there might be some positive results for District 67 if the detachment petition is granted.

On rebuttal, Dr. Vogel testified that District 67 could safely reduce its staff and consolidate its programs without lowering the quality of the educational program. He suggested that the consolidation could improve the quality in some areas. He also stated that there would be a negative impact on the detachment area students if the petition is denied. He explained that one must look at the whole child concept and be concerned with activities outside of school, such as park district programs and library programs. He stated that allowing the petition would eliminate the problem of children who are excluded from the normal activities in their community because their school is not located within the community.

Dr. William Hazzard testified as an education expert for District 67. He stated that the schools of District 67 and District 34 are fundamentally comparable. There are no significant differences in the programs, facilities or staff qualifications. He testified that there would not be a demonstrable educational benefit to the detachment area children and that there would be a detriment to the District 67 students if the petition is granted.

Dr. Hazzard also testified that there would be a detriment to the detachment area students in the transition between elementary school and high school. In his opinion, if the petition is granted, there would be a problem since the detachment area students would be attending a different high school than most of their classmates in the District 34 schools.

The director of student services at Niles North High School, the high school which the detachment area students would attend, explained the articulation process. The purpose of articulation is to have continuity in the programs and to facilitate placement of students in the high school programs. A series of meetings is held between the staffs of the junior high school and the high school in various departmental areas. The meetings are held to keep both staffs aware of any changes which would have to be made at the junior high or high school level in order for the students to make a smooth transition. The director of student services testified that Niles

North does not presently articulate with District 34, but that the articulation problem could be solved if District 34 would be willing to make the necessary changes. A letter from the director of instruction for District 34 was introduced. In the letter, the director stated that the graduates of the District 34 junior high school would be adequately prepared for the high school program at Niles North. She also stated that she presumed that a plan regarding the advanced placement of students at Niles North could be arranged.

A report which examines costs in District 67 projects the cost per student in 1982-1983 at $1,981. This projection encompasses the predicted decline in enrollment, assumes that the program quality will be maintained, incorporates an estimated inflation rate and assumes that the District will close one school in 1981. There was evidence that there will be over $2,000 available per student in District 67 after detachment. Based on 1976-1977 figures, after detachment District 67 would rank in the upper 15% of the districts in the State regarding total funds available per student.

The assessed valuation of District 67 in 1977 was approximately $75.5 million. After detachment, the assesed valuation would be approximately $62.5 million. Both of petitioners' school finance experts testified that after detachment District 67 would rank in the upper 20 percent in the State in per pupil assessed valuation, whereas it ranked in the upper 15 percent before detachment. Both experts regard District 67 as a rather wealthy district. Both agreed that there would not be any significant adverse effect on District 67 if the detachment petition is granted.

The school finance expert who testified for District 67 stated that the estimated reduction in educational expenditures for District 67 necessitated by the proposed detachment is $208,648. He determined that possible reductions in expenditures would occur in two categories. The first category would be instructional salaries and benefits; the second category would involve administrative, instructional and other accounts. He perceived the educational impact as either an increase in class size or cuts in the special programs. He concluded that the resultant reduction in services would be a significant educational detriment.

One of petitioners' school finance experts, Dr. Allen Dye, testified that there would be an economic loss of $258,320, but that the loss could be offset by other factors. He estimated savings from the closing of one school at $108,300. He also estimated savings of $100,000 for the loss of teachers that Dr. Vogel testified was possible. Dr. Dye also stated that additional levies could be made in the workmen's compensation and tort immunity funds, thereby granting approximately $20,800. According to Dr. Dye, these additional levies could pay for expenditures that are now made out of the educational fund and building fund. Additional levies in the life safety fund could generate $30,000. Another of petitioners' school finance experts

testified that District 67 is not currently levying the maximum taxes for the tort immunity fund, the special education fund and the life safety fund.

A letter from the Kraftco director of corporate real estate was also introduced. In the letter, the director stated that Kraftco had plans to construct a new corporate headquarters on its property in Glenview. Construction is scheduled to be completed in mid-1980.

Evidence was introduced showing that the District 34 schools near the detachment area have additional room to accommodate the extra students. A letter from the Board of Education of District 34 stated that a boundary change would have no adverse effect on District 34, and it endorsed the concept of coterminous boundaries which would facilitate the involvement of detachment area students in the Glenview Park District, the Glenview Public Library and other community activities.

The Glenview League of Women Voters is in favor of the detachment petition. The League is concerned about the lack of cohesiveness in the community because of confusing, noncoterminous boundaries. The League believes that the establishment of coterminous boundaries is essential for a sense of community identity and for the avoidance of the duplication of services. The Golf Village Board and the Glenview Village Board are also in favor of the detachment petition.

Twelve hundred residents of District 67 signed a petition opposing the detachment. The Board of Education of Niles Township High School District No. 219 also opposes the detachment, and resolutions opposing the detachment were adopted by all the elementary school districts in Niles Township.

District 67 argues that the Board used some irrelevant and improper standards in granting the detachment petition. In its findings of fact, the Board refers to the "whole child" concept which was introduced by Dr. Vogel. In one finding, the Board found that "when the 'whole child' is considered the educational welfare of the children in the detachment area will be enhanced by the granting of the petition so that those children will no longer be excluded in practice from normal activities and opportunities of an educational value in their own community, such as library and park district programs, from which they are presently excluded or discouraged from participating in because of their attendance at school in Morton Grove."

■■ District 67 contends that there is no legal or factual basis for these findings. To the contrary, we think that it is clear that the reference to the "whole child" concept represents concern for the participation of the children and their parents in school and after-school activities in the community, which is proper consideration. (See *Newman v. County Board of School Trustees* (1974), 19 Ill. App. 3d 584, 588, 312 N.E.2d 35, 38; *Sesser Community Unit District No. 196 v. County Board of School Trustees*

(1966), 74 Ill. App. 2d 152, 159-60, 219 N.E.2d 364, 367.) It has been recognized that increased participation in school activities by students and their families results in a salutary effect on the educational welfare of the students and the area. (*Newman*, 19 Ill. App. 3d 584, 588, 312 N.E.2d 35, 38; *Ottawa Township High School District No. 140 v. County Board of School Trustees* (1969), 106 Ill. App. 2d 439, 446, 246, N.E.2d 138, 142.) The social and extracurricular needs of the students may properly be taken into account. (See *Board of Education v. County Board of School Trustees* (1978), 60 Ill. App. 3d 415, 421, 376 N.E.2d 1054, 1059; *Newman*, 19 Ill. App. 3d 584, 588, 312 N.E.2d 35, 39.) Thus, the Board properly considered this factor in reaching its decision. Furthermore, there was ample evidence to support its conclusions relating to the "whole child" concept.

District 67 next attacks the community-of-interest factor applied by the Board in its findings as being irrelevant here. The Board found that the detachment area is part of an identifiable community-of-interest with the Village of Glenview. It went on to find that Glenview is the natural community center for the residents of the detachment area and is the center for worthwhile children's activities. Again, we disagree with District 67's argument. We believe that the community-of-interest factor, which, of course, is closely related to the concerns of the "whole child" concept, is clearly relevant here. The identity of the petitioning territory with the district to which annexation is sought is a proper consideration. (*Board of Education v. Regional Board of School Trustees* (1980), 84 Ill. App. 3d 501, 504, 405 N.E.2d 495, 498; *Bowman v. County Board of School Trustees* (1974), 16 Ill. App. 3d 1082, 1085, 307 N.E.2d 419, 421.) Participation in community affairs has been considered an important factor in a child's development. (*School District No. 106 v. County Board of School Trustees* (1964), 48 Ill. App. 2d 158, 161, 198 N.E.2d 164, 166.) Attendance at a school in a child's natural community center can enhance the educational picture of the entire area. (*Burnidge v. County Board of School Trustees* (1960), 25 Ill. App. 2d 503, 509-10, 167 N.E.2d 21, 24.) In other words, a child's identity with his community will encourage participation in school and extracurricular activities deemed important within the "whole child" concept. As the court said in *Burnidge*:

> "[A]n identification with a school district in a child's natural community center will inevitably result in increased participation in school activities by the child and his parents. Such increased participation cannot but result in an improvement in the educational picture of the entire area. By the same token, an unnatural identification with a school district would have an opposite result with a corresponding loss of participation and resulting poorer educational picture." (25 Ill. App. 2d 503, 509-10, 167 N.E.2d 21, 24.)

Thus, the Board properly considered the community-of-interest factor, and its finding relating to it was sufficiently supported by the evidence.

■■ District 67 next argues that the Board's finding regarding the wealth of District 67 in relation to other school districts in the State is irrelevant. We agree. Here, the focus should be on whether the loss of revenue will jeopardize the educational resources of the involved districts. (See *Oakdale Community Consolidated School District No. 1 v. County Board of School Trustees* (1957), 12 Ill. 2d 190, 194, 145 N.E.2d 736, 738.) In this regard, the Board found that District 67 could retain or improve the present quality of its educational programs by consolidating its programs and that granting the detachment petition would not result in any significant adverse economic impact. Therefore, the finding relating to the relative wealth of the school districts is merely surplusage.

District 67 contends that the Board's findings relating to the statutory requirements for granting a detachment petition are not based on the evidence. (Ill. Rev. Stat. 1977, ch. 122, par. 7—4.) However, a review of the record, including the maps submitted by petitioners, indicates that these findings are supported by the evidence.

■■ District 67 next maintains that the decision of the Board is against the manifest weight of the evidence. Pursuant to section 7—6 of the School Code, the county board of school trustees is to "hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto and as to the ability of the districts affected to meet the standards of recognition as prescribed by the Superintendent of Public Instruction, and shall take into consideration the division of funds and assets which will result from the change of boundaries and shall determine whether it is to the best interests of the schools of the area and the educational welfare of the pupils that such change in boundaries be granted." (Ill. Rev. Stat. 1977, ch. 122, par. 7—6.) The benefit derived by the annexing district and affected area must clearly outweigh the detriment resulting to the losing district and the surrounding community as a whole. *Oakdale*, 12 Ill. 2d 190, 193-94, 145 N.E.2d 736, 737; *Board of Education of Avoca School District No. 37 v. Regional Board of School Trustees* (1980), 82 Ill. App. 3d 1067, 1073, 403 N.E.2d 578, 582.

■■ On review, we keep in mind that the judiciary does not sit as a super school board to analyze the complex factors involved in a determination of the best interests of the schools and pupils. (*School Directors v. Wolever* (1962), 26 Ill. 2d 264, 267, 186 N.E.2d 281, 283.) Instead, we must decide whether the determination of the Board is against the manifest weight of the evidence and make certain that the standards prescribed by the legislature are complied with. *Wolever*, 26 Ill. 2d 264, 267, 186 N.E.2d 281, 283; *Avoca*, 82 Ill. App. 3d 1067, 1073, 403 N.E.2d 578, 582; *Locher v.*

*County Board of School Trustees* (1975), 29 Ill. App. 3d 271, 274, 330 N.E.2d 282, 285.

An examination of the evidence in the instant case leads us to conclude that the Board's determination was not against the manifest weight of the evidence. The Board considered the proper statutory standards, and there was sufficient evidence to support its conclusion that the benefit to the annexing and affected areas clearly outweighs the detriment to the losing district and the surrounding community as a whole.

The evidence indicated numerous benefits which would result from detachment. One of the primary benefits is the possibility of increased participation in school and extracurricular activities. The detachment area students will be able to engage in after-school sports activities provided by their own park district. It appears that their attendance at District 34 schools will encourage their participation in these activities. Prior to detachment, the detachment area students did not have any park district activities conducted at their school, and it was difficult for them to participate in park district activities at District 34 schools since the programs begin immediately after school. Although District 67 does provide a program of intramural sports following the school day, there is no bus to take the detachment area students home.

Another beneficial aspect of detachment is that the students will be attending a school which coordinates its programs with their community library. Increased participation in community activities such as Little League and Boy Scouts may also result.

Another positive result from detachment involves the safety of the detachment area students. The Board found that Golf Road presents safety problems because of its heavy traffic. By attending the District 34 schools, the detachment area students will avoid travelling on Golf Road, and they will be able to avoid the dangerous intersection of Golf and Waukegan. The fact that the District 34 schools are slightly farther from the detachment area is not determinative here.

There was also testimony that District 67 would benefit from the detachment in that the temporary overcrowding caused by the closing of one school could be alleviated. There is adequate room to accommodate the detachment area students at District 34 schools, where the educational programs are equivalent to those of District 67. Also, an obvious benefit to District 34 will result in the form of increased tax revenues.

District 67 contends that the only benefit to be gained is that detachment would be more convenient for petitioners. While we agree that mere personal preference or convenience is not sufficient alone to support a petition for detachment (*Oakdale*, 12 Ill. 2d 190, 193, 145 N.E.2d 736, 737; *Ottawa Township High School District No. 140 v. County Board of School Trustees* (1969), 106 Ill. App. 2d 439, 444, 446, 246 N.E.2d 138, 141,

142), it must be considered as one factor. (*Bowman v. County Board of School Trustees* (1974), 16 Ill. App. 3d 1082, 1085, 307 N.E.2d 419, 421; *Ottawa Township*, 106 Ill. App. 2d 439, 447, 246 N.E.2d 138, 142.) In the instant case, there are many benefits in addition to the personal preference and convenience of petitioners.

■■ As for detriment, District 67 argues that the financial impact of detachment will have a substantial negative effect. It should be noted that when dealing with a detachment petition, the loss of revenue is inevitable. Even though there is a depletion of tax resources, that alone should not prevent the granting of the petition if maximum taxes are not being levied. *Newman v. County Board of School Trustees* (1974), 19 Ill. App. 3d 584, 588, 312 N.E.2d 35, 38; *Bowman*, 16 Ill. App. 3d 1082, 1086, 307 N.E.2d 419, 422; *Albrecht v. Newcomer* (1964), 53 Ill. App. 2d 24, 28, 202 N.E.2d 353, 355.

The Board found that if the detachment petition is granted, District 67 can retain or improve the present quality of its educational program by consolidating its programs. We believe that this finding is supported by the evidence. Taking all factors into consideration, the Board could have properly found that the educational resources of District 67 would not be jeopardized. The economic loss could be offset in a number of ways. First, the Board's finding that District 67 is not presently levying its maximum tax rate is supported by the evidence. The Board also found that District 67 would save money by consolidating its programs. This consolidation could be accomplished because of a smaller number of students due to detachment and the closing of one school in the district. Evidence also showed that Kraftco is building a new headquarters within the district, which may generate additional revenue. Furthermore, there was evidence that the tax revenue available to District 67 would be adequate to cover the projected cost per student. (*Cf. Calvert v. Board of Education* (1963), 41 Ill. App. 2d 389, 395, 190 N.E.2d 640, 643.) In sum, we believe that the Board's finding that detachment will not have a significant adverse economic impact on District 67 is proper.

We cannot accept District 67's argument that articulation will be a problem. The Board found and the evidence supports the finding that there will be no incompatibility between the programs in the elementary schools in District 34 and High School District 219. There was testimony that any articulation problem could be solved once District 34 makes the necessary changes.

■■ In conclusion, the Board could have properly found that it is in the best interest of the schools in the area and the educational welfare of the pupils that the requested change in boundaries be granted. The numerous benefits outweigh any insignificant economic detriment to District 67.

Finally, District 67 argues that the trial court erred in entering an order

which permits children from the detachment area to attend school in District 34 during the pendency of the matter. The Board entered its order granting the detachment petition on August 27, 1979. On August 31, 1979, the trial court entered an order allowing the detachment area children to attend the District 34 schools. Subsequently, the trial court ordered District 67 to pay nonresident tuition to District 34 for all of the detachment area children electing to attend District 34 schools.

■■ We agree with District 67 that the court improperly entered this order. Section 7—7 of the School Code provides that the "commencement of any action for review shall operate as a supersedeas, and no further proceedings shall be had until final disposition of such review." (Ill. Rev. Stat. 1977, ch. 122, par. 7—7.) In interpreting the predecessor to this statute in *People ex rel. Nordstrom v. Barry* (1957), 11 Ill. 2d 259, 261-62, 142 N.E.2d 33, 34, the supreme court said:

> "[The legislature] evidently had a purpose in mind in employing the particular language to the effect that no further proceedings should be had until final disposition of the review. It is quite understandable that the legislature would deem it desirable to maintain the original *status quo* of the school districts of this State when territorial and boundary questions arose for the purpose of giving stability and certainty to these matters instead of confusion and uncertainty where public education and public funds are concerned."

Section 7—9 of the School Code also supports our conclusion in that it provides:

> "In the event, that the granting of a petition has become final, either through failure to seek Administrative Review or by the final decision of a court on review, the change in boundaries shall become effective forthwith. However, if the granting of the petition becomes final between September 1 and June 30 of any year, the administration of and attendance at the schools shall not be affected until the following July 1, when the change in boundaries shall become effective for all purposes." (Ill. Rev. Stat. 1977, ch. 122, par. 7—9.)

Thus, the clear mandate of the School Code prevented the trial court from altering the attendance of the schools. Contrary to District 34's contention, we believe that this mandate takes precedence over the general power of the circuit court to stay the decision of the administrative agency in whole or in part. Ill. Rev. Stat. 1977, ch. 110, par. 275.

Having decided that the trial court improperly allowed the alteration of attendance at the schools, we are faced with the problem of the payment of tuition. Although the trial court's order was improper, we nevertheless believe that District 67 should pay tuition to District 34 for the students who

chose to attend District 34 schools pursuant to the trial court's order.

Accordingly, that part of the trial court's order affirming the decision of the Board is affirmed. The portion of the order allowing children from the detachment area to attend school in District 34 during the pendency of this matter is reversed with directions that District 67 should pay tuition for those students who elected to attend District 34 schools pursuant to the trial court's order.

Affirmed in part and reversed in part with directions.

McGILLICUDDY, P. J., and McNAMARA, J., concur.